SAWYER STORES, INC., PLAINTIFF, *v.* MITCHELL, SECRETARY OF STATE, ET AL., DEFENDANTS.

(No. 7,629.)

(Submitted October 7, 1936. Decided November 2, 1936.

[62 Pac. (2d) 342.]

*Mr. Lester H. Loble, Mr. T. J. Davis* and *Mr. Melvin E. Magnuson,* for Plaintiff, submitted a brief and argued the cause orally.

*Mr. Horace S. Davis,* for Defendants, submitted a brief and argued the cause orally.

HONORABLE FRANK P. LEIPER, District Judge, sitting in place of CHIEF JUSTICE SANDS, absent on account of illness, delivered the opinion of the court.

This is an original proceeding commenced in this court in which plaintiff seeks an order permanently restraining the Secretary of State for Montana from certifying to the county clerks of its several counties Initiative Measure No. 39, and

likewise restraining the county clerk of Lewis and Clark County from distributing copies thereof.

The action was commenced on the 1st day of October, 1936. Order to show cause thereupon issued requiring the defendants to appear on October 7, 1936, and then show cause why the prayer of the complaint should not be granted. The defendants appeared by separate demurrers and (reserving the questions therein raised) answered. Hearing was had on October 7 and the cause then submitted. On October 8 this court issued an injunction as prayed for in the complaint. Such order preceded the opinion herein for the reason that the Secretary of State is required to certify to the county clerks of the several counties all initiative measures, and October 8 was the last day allowed by law for the performance of that duty.

The demurrers challenge the sufficiency of the complaint in the following particulars: (a) That the complaint does not state a cause of action; (b) that the plaintiff has not the legal capacity to sue; (c) that there is a defect of parties defendant in that it is charged that each county clerk of the several counties should have been made parties defendant; and (d) that this court is without jurisdiction herein.

The complaint alleges and the answer admits that the plaintiff is a corporation organized under the laws of the state of Montana; that it is engaged in the general merchandise business within this state and has operated, now operates and intends to continue to operate 19 stores within this state; that the defendant Mitchell is the Secretary of State of the state of Montana; that defendant Duncan is the county clerk of Lewis and Clark county; that the plaintiff is duly licensed, under the provisions of Chapter 155 of the Session Laws of 1933, to operate such stores; that a true copy of proposed measure No. 39 and the form of ballot by which it is proposed to submit that measure are attached to and made a part of the complaint; that the defendant Secretary of State will, unless restrained by an order of this court, certify such measure to the county clerks of the several counties; and that defend-

ant Duncan will distribute. the same to the electors of Lewis and Clark county unless restrained from so doing.

The complaint alleges, among other things, that the ballot by which it is proposed to submit Initiative Measure No. 39 to the electors of this state does not comply with the provision of our statute in a number of particulars, among which are: That the ballot is not descriptive of the measure proposed; that it is false, deceptive and misleading; that it does not refer to proposed Initiative Measure No. 39; that the title placed upon the ballot fails to disclose the repeal of Chapter 155, Session Laws of 1933; that the ballot does not comply with the provisions of our statutes in relation to the type of ballot which the law requires to be submitted to the electors when an initiative measure is submitted, and particularly that it does not comply with the provisions of section 104, Revised Codes 1935. These allegations are denied by the answer. The constitutionality of proposed measure No. 39 is called in question, and the allegations in that regard are denied by the answer. It is alleged that the plaintiff does not have any plain, speedy or adequate remedy in the ordinary course of the law; that the questions presented are of vital interest to all of the people of this state; and that if the relief prayed for is not granted, the state will be put to great additional expense by reason of the submission of the measure through the printing of the ballots and otherwise, all of which allegations are denied by the answer.

The answer, by way of affirmative defense, alleges that an action was commenced in the district court of Lewis and Clark county by one Matthews in July, 1936; that by that action the petitions filed with the Secretary of State looking to the submission of the measure in question were called in question; that that action was terminated on September 4, 1936, in favor of the defendant Secretary of State; that the plaintiff therein was represented by the same counsel as appear herein; that after the termination of such action the Secretary of State, in pursuance of his duties as such officer, caused to be printed many thousands of copies of this proposed

measure and distributed the same as provided by law; that the state has thereby been put to great expense; that the plaintiff herein knew, or should have known, all of these matters; and that because thereof this plaintiff is estopped from now calling any of these matters in question. A number of questions are presented, but the conclusions at which we have arrived make necessary the consideration of the following only:

1. Does the form of the ballot by which it is proposed to submit Initiative Measure No. 39 comply substantially with the law in that regard?

2. Is this court empowered, in a situation such as is here presented, to grant the relief prayed for, or to grant any relief?

3. May plaintiff maintain this action?

4. Is the plaintiff estopped from prosecution of this action?

Ordinarily, this court would consider first the jurisdictional question, and whether or not the plaintiff may maintain this action; but these questions are dependent, at least in part, upon the nature of the matter presented, whether or not it is such as that the liberties of all the people are involved, or whether the people of this state generally have an interest in the subject matter of this suit; and, since these questions must be developed in the consideration of the question whether or not the form and contents of the ballot comply substantially with the law, we shall first direct our attention to that phase of the cause.

In 1905 the legislative department of this state determined to submit to the electors thereof an amendment to section 1 of Article V of the Constitution of Montana, relating to the right of the electors to initiate certain laws, and as well to provide for the reference of Acts passed by the legislature. This determination was voiced by the enactment of Chapter 61 of the Session Laws of 1905. At the general election held in 1906 such amendment was submitted to and adopted by the qualified electors of this state and became and now is a part of section 1 of Article V of our Constitution. It is under the

provisions of that section of our Constitution, together with the statutes thereafter enacted, that Initiative Measure No. 39 is proposed.

This constitutional amendment provides in part: "And in submitting the same [initiative and referendum measures] to the people, he (secretary of state), and all other officers, shall be guided by the general laws and the Act submitting this amendment, until legislation shall be especially provided therefor."

Chapter 61, among other things, provides: "It shall be the duty of the Legislative Assembly to enact legislation suitable for carrying this amendment into effect." (Section 2.)

Obedient to that command of the electorate, our legislature has from time to time enacted statutes relating to the submission of initiative and referred measures, which Acts are comprised within sections 99 to 108, inclusive, Revised Codes 1935.

We are here concerned with the provisions of those statutes only which relate to the contents and form of the ballot by which an initiative measure may be submitted.

Sections 103 and 104, Revised Codes 1935, set forth that which the ballot shall contain, together with its form. As hereinbefore noted, the contents and form of the ballot by which it is proposed to submit Initiative Measure No. 39 are set forth in the complaint and admitted by the answer. In order to determine whether or not the contents and the form of this proposed ballot substantially comply with the provisions of sections 103 and 104, let us first examine the provisions of those sections in that regard, and then compare those provisions with the contents and form of the proposed ballot. Section 103, in so far as material here, provides:

"The secretary of state, at the same time that he furnishes to the county clerk of the several counties certified copies of the names of the candidates for office, shall also furnish the said county clerks his certified copy of the titles and numbers of the various measures to be voted upon at the ensuing general or special election, and he shall use for each measure a title desig-

nated for that purpose by the legislative assembly, committee, or organization presenting and filing with him the Act, or petition for the initiative or the referendum, or in the petition or Act; provided, that such title shall in no case exceed one hundred words, and shall not resemble any such title previously filed for any measure to be submitted at that election *which shall be descriptive of said measure,* and he shall number such measures. All measures shall be numbered with consecutive numbers beginning with the number immediately following that on the last measure filed in the office of the secretary of state. *The affirmative and negative of each measure shall bear the same number,* and no two measures shall be numbered alike. It shall be the duty of the several county clerks to print said titles and numbers on the official ballot prescribed by section 678, in the numerical order in which the measures have been certified to them by the secretary of state.''

Section 104 provides: ''The manner of voting on measures submitted to the people shall be by marking the ballot with a cross in or on the diagram opposite and to the left of the proposition for which the voter desires to vote. The following is a sample ballot representing negative vote:

'' ☐ For Initiative Measure No. 6
    Relating to Duties of Sheriffs.
'' ☒ Against said Measure No. 6.
'' ☐ For Referendum Measure No. 7
    Relating to Purchase of Insane Asylum.
'' ☒ Against said Measure No. 7.

''and no title on a ballot shall contain more than ten words, *which shall be descriptive of the measure proposed.*''

The ballot by which it is proposed to submit this measure to the electors is as follows:

''Proposed Petition For Initiative No. 39.

''An Act requiring licenses for the opening and establishment, operation and maintenance of stores in this state, the classifying of such stores, prescribing the license fees to be paid therefor and the disposition thereof into the state old age assistance fund, and the powers and duties of the State

Board of Equalization in connection therewith; and prescribing penalties for the violation thereof.

"☐ For providing old age pension funds by licensing chain stores.

"☐ Against providing old age pension funds by licensing chain stores."

In order to ascertain whether or not this ballot complies substantially with the statutes above—whether the "title" and the "legend" are descriptive of the proposed measure—it becomes necessary to examine some of the provisions of that measure. Sections 5, 6, 8, 9, 11 and 13 thereof read as follows:

"Section 5. Every person, firm, corporation, association, co-partnership or group opening, establishing, operating or maintaining one or more stores or mercantile establishments within this state, under the same general management, supervision or ownership, where a stock of goods is maintained during any portion of the year, regardless of whether said stock is held by ownership, consignment, agency or any other means, shall pay the license fee hereinafter prescribed for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments, provided that the members of any group, association or consumer co-operative composed of independent units owning their own business and grouped or associated together by agreement or otherwise for the purpose of purchasing or selling merchandise or service for the mutual benefit of the members shall not be grouped for computing the license fee to be paid by such person, firm, corporation, association, or co-partnership or by such wholesaler or retailer under this Act, but such units or members shall be taxed as individual units; and provided further that the term store shall not mean or include for the purpose of computing the license fee prescribed in this section the following types of business, but that they shall be licensed under the prescribed fees in Section Six (6) of this Act; gasoline filling stations and/or gasoline distributing plants where seventy-five per cent. (75%) of the gross business is in petroleum products exclusively; or lumber yards where seventy-five per cent. (75%) of

the gross business is in building materials exclusively; or grain elevators where seventy-five per cent. (75%) of the gross business is dealing in grains and seeds exclusively; and those businesses in which the sale of goods, wares, and merchandise is less than twenty-five per cent. (25%) of the gross business.

"The license fee herein prescribed shall be paid annually, and shall be in addition to the filing fees prescribed in Sections Two (2) and Four (4) of this Act.

"The annual license fees herein prescribed shall be as follows:

"1. Upon one store the annual license fee shall be Two Dollars and Fifty Cents ($2.50).

"2. Upon the second store, the annual license fee shall be Twenty-five Dollars ($25.00).

"3. Upon the third store, the annual license fee shall be Seventy-five Dollars ($75.00).

"4. Upon the fourth store, the annual license fee shall be Two Hundred and Twenty-five Dollars ($225.00).

"5. Upon the fifth store, the annual license fee shall be Six Hundred and Seventy-five Dollars ($675.00).

"6. Upon the sixth store, and upon each store in excess of six, the annual license fee shall be One Thousand Dollars ($1,000.00).

"Section 6. Every person, firm, corporation, association, co-partnership or group opening, establishing, operating or maintaining one or more stores or mercantile establishments within this State under the same general management, supervision or ownership, where a stock of goods is maintained during any portion of the year, regardless of whether said stock is held by ownership, consignment, agency or any other means, who deal in petroleum products, building materials and grain elevators, and those businesses in which the sale of goods, wares and merchandise is less than 25% of the gross business, subject to the following restrictions: Gasoline filling stations and/or gasoline distributing plants where 75% of the gross business is in petroleum products exclusively; those businesses in which the sale of goods, wares and merchandise is less than

25% of the gross business; lumber yards where 75% of the gross business is in building materials exclusively; grain elevators where 75% of the gross business is in grains and seeds exclusively, shall pay the annual license fee prescribed in this Section for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments, but shall not be required to pay the license fees prescribed in Section 5 of this Act.

"The annual license fee herein prescribed shall be paid annually, and shall be in addition to the filing fees prescribed in Sections two (2) and four (4) of this Act.

"The annual license fees herein prescribed shall be as follows:

"1. Upon one store the annual license fee shall be two dollars and fifty cents ($2.50).

"2. Upon the second store, the annual license fee shall be five dollars ($5.00).

"3. Upon the third store, the annual license fee shall be ten dollars ($10.00).

"4. Upon the fourth store, the annual license fee shall be fifteen dollars ($15.00).

"5. Upon the fifth store, the annual license fee shall be twenty dollars ($20.00).

"6. Upon the sixth store, and each store in excess of six, the annual license fee shall be twenty-five dollars ($25.00).

"Section 8. The provisions of this Act shall be construed to apply to every person, firm, corporation, co-partnership or group, either domestic or foreign, which is controlled or held in any degree with others by majority stock ownership or ultimately controlled or directed by one management or association of ultimate management.

"Section 9. The term 'store' as used in this Act shall be construed to mean and include any store or stores or any mercantile establishment or establishments which are owned, operated, maintained or controlled by the same person, firm, corporation, association, co-partnership, or group, either domestic or foreign, in which goods, wares or merchandise of any

kind are sold, either at retail or wholesale; and subject to the classification contained in Sections five (5) and six (6) of this Act.

"Section 11. The State Board of Equalization is hereby authorized to employ such clerical and field assistance as may be found necessary to carry out and to administer the provisions of this Act. All money collected under the provisions of this Act, less the expenses incurred in the administration of this Act, shall be paid into the State Treasury, monthly, and shall be added to and constitute a part of the State Old Age Assistance Fund, as prescribed in Chapter 170, Session Laws of 1935.

"Section 13. All Acts and parts of Acts in conflict herewith are hereby repealed, and expressly repealing Chapter 155 Session Laws of 1933."

The "title" on the ballot need not be a copy of the "title" of the proposed measure. The former may not contain more than one hundred words. (*State ex rel. Bonner* v. *Dixon,* 59 Mont. 58, 195 Pac. 841.)

The word "title" is used in section 103 in referring to the description of the measure proposed, which shall not contain more than one hundred words; and the word "title" is again used in section 104 in reference to the descriptive matter, which shall not contain over ten words. In order to avoid confusion, we shall refer herein to the word "title," as used in section 104, as "legend."

The "legend" shall contain not to exceed ten words, *which shall be descriptive of the measure proposed.* The Century Dictionary defines the term ".descriptive" as "containing a description; serving or aiming to describe; having the quality of representing." The supreme court of Massachusetts, in speaking of that word in relation to a matter very similar to the one now under consideration has this to say:

" 'Description' in these circumstances signifies a fair portrayal of the chief features of the proposed law in words of plain meaning so that it can be understood by the persons entitled to vote. It must be complete enough to convey an intelligible idea of the scope and import of the proposed law.

It ought not to be clouded by undue detail, nor yet so abbreviated as not to be readily comprehensible. It ought to be free from any misleading tendency, whether of amplification, of omission, or of fallacy. It must contain no partizan coloring. It must in every particular be fair to the voter to the end that intelligent and enlightened judgment may be exercised by the ordinary person in deciding how to mark the ballot.'' (*In re Opinion of the Justices*, 271 Mass. 582, 171 N. E. 294, 297, 69 A. L. R. 388.)

The inquiry becomes pertinent as to the purpose of our legislature in requiring that the ballot shall contain a ''title'' of not exceeding one hundred words, and a ''legend'' of not over ten words, each of which ''shall be descriptive of the proposed measure.''

The distinction between the term ''ballot'' and the term ''vote'' must be kept clearly in mind. The former (ballot) is merely the piece of paper upon which the voter gives expression to his choice. (*State* v. *Blaisdell*, 18 N. D. 31, 119 N. W. 360; *Clary* v. *Hurst*, 104 Tex. 423, 138 S. W. 566.) A vote ''is the formal expression of a will, preference, wish or choice in regard to any measure proposed, in which the person voting has an interest in common with others, either in electing a person to fill a certain situation or office, or in passing laws, rules, regulations,'' etc. (Century Dictionary.)

Manifestly, the purpose of submitting this proposed measure to the vote of the people is to ascertain whether or not a majority of the electors are in favor of its becoming a part of the law of this state. *The purposes of the ballot are: (1) To inform the voters of the nature and purposes of the measure; and (2) to afford each elector a means of expressing his approval or disapproval thereof, that is, voting thereon.*

Counsel for the defendants insist that, since the law requires that a copy of every proposed measure shall be mailed to each elector, thereby each voter is afforded the means whereby he may familiarize himself with the provisions of the measure upon which he is voting, and that the contents of the ballot are therefore immaterial. The answer to that argument is the fact that the law makes certain requirements

as to what the ballot shall contain, and that these requirements must be met. It is not for this court to set aside or repeal an enactment of the legislative department of this state. This court cannot dispense with statutory formalities. It is worthy of note, too, that if each voter devotes himself to a consideration of the contents of each proposed measure submitted, by carefully reading and studying the same, then, theoretically at least, he becomes informed as to the nature and purposes of a proposed initiative measure; but, as remarked by the supreme court of Arkansas in the case of *Westbrook* v. *McDonald*, 184 Ark. 740, 43 S. W. (2d) 356, 360, 44 S. W. (2d) 331:

"The majority of qualified electors are so much interested in managing their own affairs that they have no time carefully to consider measures affecting the general public. A great number of voters undoubtedly have a superficial knowledge of proposed laws to be voted upon, which is derived from newspaper comments or from conversation with their associates. We think the assertion may safely be ventured that it is only the few persons who earnestly favor or zealously oppose the passage of a proposed law, initiated by petition, who have attentively studied its contents and know how it will probably affect their private interests. Te greater number of voters do not possess this information and usually derive their knowledge of the contents of a proposed law from an inspection of the title thereof, which is sometimes secured only from the very meager details afforded by a ballot which is examined in an election booth preparatory to exercising the right of suffrage."

If the foregoing quotation be true (and we think it is), all the more reason exists for a compliance with the provisions of our statutes in relation to the descriptive matter which is required to be placed on the ballot by which a proposed measure is submitted.

The "title" on the ballot is not descriptive of the measure submitted, for many reasons, among which are: That section 13, supra, of the proposed Act specifically repeals Chapter

155 of the Session Laws of 1933. No mention whatsoever of that fact is made in the title, or elsewhere upon the ballot. A comparison of the provisions of Chapter 155, supra, with those of the proposed measure, shows that stores are licensed under the provisions of such chapter, as well as under the proposed measure; but that the license fees under such chapter are different in most instances from those as set forth in the proposed measure. For the purpose of comparison, the following shows, in the first column, the number of stores operated; in the second column, the license required to be paid by the operator of one or more stores under Chapter 155, supra; in the third column, the license required to be paid by the operator of one or more stores classified under section 6 of the proposed measure; and in the fourth column, the license required to be paid by the operator of one or more stores classified under section 5 of the proposed measure:

| No. of Stores Operated | License Under Ch. 155 | License Under Sec. 6 | License Under Sec. 5 |
|---|---|---|---|
| 1 | 2.50 | 2.50 | 2.50 |
| 2 | 5.00 | 7.50 | 27.50 |
| 3 | 20.00 | 17.50 | 102.50 |
| 4 | 35.00 | 32.50 | 327.50 |
| 5 | 55.00 | 52.50 | 1002.50 |
| 6 | 75.00 | 77.50 | 2002.50 |
| 7 | 100.00 | 102.50 | 3002.50 |
| 8 | 125.00 | 127.50 | 4002.50 |
| 9 | 150.00 | 152.50 | 5002.50 |
| 10 | 175.00 | 177.50 | 6002.50 |
| 11 | 205.00 | 202.50 | 7002.50 |
| 12 | 235.00 | 227.50 | 8002.50 |
| 13 | 265.00 | 252.50 | 9002.50 |
| 14 | 295.00 | 277.50 | 10002.50 |
| 15 | 325.00 | 302.50 | 11002.50 |
| 16 | 355.00 | 327.50 | 12002.50 |
| 17 | 385.00 | 352.50 | 13002.50 |
| 18 | 415.00 | 377.50 | 14002.50 |
| 19 | 445.00 | 402.50 | 15002.50 |

May it be said that when a voter places a cross in the ██ ██ square preceding the words, "For providing old age pension funds by licensing chain stores," he thereby registers his will as favoring the repeal of Chapter 155 of the Session Laws of 1933? We think not. Can it be said that when a cross is placed in the square preceding the words last above quoted, the voter thereby expresses his will as being in favor of increasing the license charged the operator of 19 stores which come within section 5 of the proposed measure from $445 to $15,002.50? We think not. Can it be said that a voter who places a cross in the square preceding the last above-quoted words favors the reduction of the license paid by the operator of 19 stores coming within the class mentioned in section 6 of the proposed measure from $445 to $402.50? No such purpose can be attributed to the voter, for nothing upon the ballot informs him of the purpose to repeal Chapter 155.

The "legend" contained upon the ballot is not descriptive of the proposed measure. A voter by placing a cross before the words contained on the ballot, "For providing old age pension funds by licensing chain stores," does not thereby voice his approval of the measure in question at all. He thereby says that he is in favor of old age pension funds and that he is in favor of providing these through the licensing of chain stores; but the term "chain stores" is not defined by the measure, and in fact not used therein at all. The proposed measure licenses all stores, as defined by section 9 of the proposed measure. Under it the owner of one store is subject to the license, and certainly no one may with consistency contend that the term "chain store" means but one store. Under the provisions of the Act, gasoline filling stations, lumber-yards, and grain elevators are subject to a license. Counsel for the defendants assert that the term "chain store" has a well-defined meaning, which is understood by all. Upon the mention of "chain stores" does one's mind revert to lumber-yards, gasoline filling stations or to grain elevators? The question answers itself. Instead of enlighten-

ing the voter as to the nature and purposes of this measure, precisely the opposite is accomplished by this legend. This regardless of what the intentions of the proponents of this measure may have been in framing the legend. Instead of informing the voter of the nature and purposes of the proposed measure, the legend "For providing old age pension funds by licensing chain stores" tends to deceive, delude and mislead him in many particulars. Instead of informing the voter, it misinforms him. Its wording is calculated to appeal not to the reason of the voter, but rather to his passion and prejudice. Through such deception it is sought to gain the consent of a majority of the electors to this proposed measure. That this amounts to a fraud upon the electorate of this state cannot be doubted.

But further, section 103 provides: "The affirmative and negative of each measure shall bear the same number." The only inference that it is possible to draw from that provision is that the ballot shall contain the affirmative as well as the negative of each measure, and that the affirmative and the negative thereof shall bear the same number. That inference becomes an established fact when the provisions of section 104 are considered in connection with the provisions of section 103 last above quoted. Manifestly, the purpose of the legislature was that there should be placed upon the ballot either the precise words "For initiative measure No. 39" and "Against said measure No. 39," or their equivalent, and that each of these should be preceded by a square in which the voter may voice his will by placing a cross in the square before the former or the latter. But this ballot affords no means whatsoever by which the voter may express his will upon the measure submitted.

Prior to the amendment of section 1 of Article V of our Constitution, the sole means for the enactment of a law was through an Act of our legislature. The framers of our Constitution placed restrictions upon the legislature in the enactment of these laws, among which are the following, all contained within Article V of our state Constitution:

"Sec. 22. No bill shall be considered or become a law unless referred to a committee, returned therefrom, and printed for the use of the members.

"Sec. 23. No bill, except general appropriation bills, and bills for the codification and general revision of the laws, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be so expressed. * * *

"Sec. 33. The general appropriation bills shall embrace nothing but appropriations for the ordinary expenses of the legislative, executive and judicial departments of the state, interest on the public debt and for public schools. *All other appropriations shall be made by separate bills, each embracing but one subject.* * * *

"Sec. 44. A member who has a personal or private interest in any measure or bill proposed or pending before the legislative assembly, shall disclose the fact to the house of which he is a member, and shall not vote thereon."

The purpose of having a bill referred to a committee is that it shall be given careful consideration, and then be printed, to the end that each member of that body may acquaint himself with its provisions.

Speaking of section 23, above, this court, in the case of *State* v. *Mitchell,* 17 Mont. 67, 42 Pac. 100, 102, holds that the title of an Act "is an indispensable part of every Act," and the court quotes with approval Judge Cooley, as follows: " 'It may therefore be assumed as settled that the purpose of these provisions was: First, to prevent hodgepodge or "log-rolling" legislation; second, to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in

order that they may have opportunity of being heard thereon, by petition or otherwise, if they shall so desire. * * * The general purpose of those provisions is accomplished when a law has but one general object, which is fairly indicated by its title. To require every end and means necessary or convenient for the accomplishment of this general object to be provided for by a separate Act, relating to that alone, would not only be unreasonable, but would actually render legislation impossible.' (*Vide* extended note to *Davis* v. *State*, 61 Am. Dec. 337.)''

In the case of *State ex rel. Holliday* v. *O'Leary*, 43 Mont. 157, 115 Pac. 204, 206, this court, speaking through Mr. Justice Holloway, in relation to these constitutional provisions, and particularly as to section 23, supra, observed: ''To restrict the legislature to the enactment of laws the objects of which legislators and the public as well may be advised of, to the end that any who are interested, whether as representatives or those represented, may be intelligently watchful of the course of the pending bill. The limitation is likewise designed to prevent legislators and the people from being misled by false or deceptive titles, and to guard against fraud in legislation by way of incorporating into a law provisions concerning which neither legislators nor the public have had any intimation through the title read or published. However refined the distinction we have made above may appear, it is not without merit. It is a part of our constitutional history that during the early years of our existence as a nation, few, if any, of our state Constitutions contained a provision similar to the one referred to herein. It is doubtful if any state Constitution now omits it. It was early discovered that ambitious or designing legislators, prompted by selfish motives or motives of less merit, procured the enactments of measures by reason of their high-sounding or popular titles, when in fact the title merely cloaked a purpose contrary to that expressed; and it was to prevent the members of the legislature and the people generally from being thus imposed upon that these provisions have been adopted. An interesting historical sketch of the

conditions which led to the adoption of a like provision in the Constitution of New York will be found in *Matter of City of New York,* 57 App. Div. 166, 68 N. Y. Supp. 196.''

The supreme court of Virginia, in the case of *Commonwealth* v. *Brown,* 91 Va. 762, 21 S. E. 357, 360, 28 L. R. A. 110, commenting upon a provision of the Constitution of that state similar to our section 23, says: ''The provision of the Constitution is a wise and wholesome one. Its purpose is apparent. It was to prevent the members of the legislature and the people from being misled by the title of a law. It was intended to prevent the use of deceptive titles as a cover for vicious legislation, to prevent the practice of bringing together into one bill for corrupt purposes subjects diverse and dissimilar in their nature, and having no necessary connection with each other; and to prevent surprise or fraud in legislation by means of provisions in bills of which the titles gave no intimation.'' This court in a long line of decisions has approved that language.

A bill introduced in the lower house of the legislature is first read and reread, then referred to an appropriate committee, carefully considered by that committee, and if it be therein determined that the bill shall pass, it is so recommended. Thereafter that measure comes up for consideration by the committee of the whole, comprising the entire membership of the House. If the measure meets the approval of a majority of such membership, then it thereafter comes on for final passage; and if it meets with the approval of the majority, is passed and sent to the Senate, where precisely the same procedure is followed. If the measure receives the approval of the Senate, then it is signed by the presiding officer of that body, and by the Speaker of the House; then referred to the Governor. It will be noted, too, that no member of the legislative assembly is permitted to vote upon any measure in which he may have a personal or private interest. (Sec. 44, Art. V, supra.)

Having in mind the safeguards that are thus thrown about a measure coming before the legislature, and the purposes of

those safeguards, it is instructive to note the difference in the conditions under which a measure is submitted to the electorate of this state. The members of the legislature meet for the purpose of considering legislation, and for a period of sixty days that, with a few exceptions, is their sole business. The members of that body have the advantage of conference, that is, of conferring together and each gaining from the other such information as each may possess concerning a given measure. That alone is of inestimable value; but is not practicable where a measure is submitted to the electorate. The voter to whom a measure is submitted has a business or occupation other than that of the consideration of legislation. The measure is submitted to the banker, the merchant, the farmer, the lawyer, the laborer, the housewife. In other words, the voter is of necessity devoting a very large part of his time and energy to the conduct of his business, to the performance of the divers and sundry duties which devolve upon the citizen in the management of his affairs, in the earning of a livelihood, or in caring for a home. If it be wise (and experience has proven that it is) that so many safeguards be thrown about the legislature in connection with the enactment of a measure into a law, how much more necessary is it that those safeguards surrounding the submission of a proposed measure to the vote of the electorate be observed. The fact is that many initiative measures are sponsored by those who have a direct personal interest in that particular legislation, and each is permitted to vote thereon. The direct opposition to such a measure usually arises from those whom the measure affects detrimentally, in their business or otherwise, and they are permitted to vote thereon. These two groups usually comprise but a small minority of the electorate of the state. The thing which must be apparent to everyone is the very great importance of a substantial compliance with those laws above referred to (secs. 103 and 104) which were enacted for the purpose of safeguarding the ballot and giving notice to the voter of the

nature and purpose of the initiative measure, to the end that the result shall represent the will of a majority of the voters.

In the case of *Smith* v. *State ex rel. Hepburn,* 28 Okl. 235, 113 Pac. 932, 940, it appears that an initiative measure was submitted to the electorate, and the question presented to the court was whether or not in submitting the measure the form of ballot used was a substantial compliance with the statutes of that state, and incidentally whether the electors had been afforded an opportunity of voting upon the questions involved in such proposed measure. The facts therein, together with the comments of the court, may best be presented by quoting from the decision, as follows:

"Without attempting to construe the bill, speaking generally, it provides: (1) For the permanent location of the capital of the state by election. (2) Makes the place receiving a majority of the votes cast at that or a final election the permanent capital of the state. (3) Declares three certain cities candidates for the permanent location of said capital and that:

"The ballots and ballot title to be used and voted at such elections shall be prepared, certified and printed as provided by the Act of the legislature approved April 16th, 1908, entitled, * * * but shall read in substance as follows: Shall the capital of the state of Oklahoma be permanently located as provided in State Question, Initiative Petition No. —— (insert here number petition submitting this bill will bear).

"( ) Yes.

"( ) No.

"Shall the capital of the state of Oklahoma be permanently located at:

| | | |
|---|---|---|
| "Oklahoma City | ( ) | Yes. |
| "Shawnee | ( ) | Yes. |
| "Guthrie | ( ) | Yes. |
| "............................ | ( ) | Yes. |
| "............................ | ( ) | Yes. |

. "(4) Authorizes any other city, town or place to become a candidate upon petition, etc. (5) Prescribes the procedure for a second election in the event no candidate received a majority of the votes cast at the first election. (6) Creates a State Capital Commission to be appointed by the Governor. (7) Prescribes their tenure of office, salaries, etc. (8) Makes said Commission a body corporate with powers to sue and be sued. (9) Empowers said Commission to purchase land for the capital site and locate the state buildings. (10) Authorizes the Commission to exercise the power of eminent domain. (11) Empowers said Commission to select land belonging to the state for capital purpose, and to cause the same to be appraised and paid for by the state. (12) Authorizes said Commission to plat and sell the lands thus acquired and create a building fund. (13) Empowers said Commission to employ engineers, architects, and clerical help at the expense of the state and fix their compensation. (14) Empowers said Commission to enter into a contract for the construction of a capitol building, subject to the approval of the legislature. (15) Makes an appropriation of $600,000 for the use of said Commission.

"In submitting this bill for adoption or rejection by the people at the polls at the election held June 11, 1910, pursuant to the call of the Governor for that purpose, it is clear that, as there was no competing question, and the adoption or rejection of the proposed bill was one of the questions to be submitted at that election, pursuant to the intent of the petition initiating the bill, which reads: 'The questions we herewith submit to our fellow voters are: Shall the following bill be adopted, and shall the capital of the state be permanently located at one of the cities, towns or places mentioned or described on the ballot and ballot title to be used and voted at such election?

"After the ballot title there should have been submitted on the ballot a question in substantial compliance with that prescribed by the Act of April 16, 1908, which reads:

"'Shall it be adopted?       ('Yes')    ☐
                             ('No')     ☐

"This question, however, was entirely omitted from the ballot, but instead was used the following:

"Ballot Title.

"Proposes to permanently locate State Capital; creates Commission of three to be appointed by Governor, January 1st, 1911, or sooner; defines powers and duties; appropriates six hundred thousand dollars to purchase not to exceed two thousand acres, state to be reimbursed from sale of lots; capital fund created therefrom, board may exercise power of eminent domain; said Commission and School Land Commissioners to appraise value of lands and improvements separately; makes Oklahoma City, Guthrie, Shawnee candidates; provides for others by petition; proposes separately to determine questions:

"(1) Shall capital be located, and (2) Where.

"(   ) Yes.

"(   ) No.

"Shall the capital of the state of Oklahoma be permanently located at:

"Oklahoma City                      (   )   Yes.
"Shawnee                            (   )   Yes.
"Guthrie                            (   )   Yes.

"The result is that the question, 'Shall it (the bill) be adopted?' has not been voted on at all nor the bill adopted, unless, as is contended, an affirmative vote on the question, 'Shall the capital be located?' is an affirmative vote on the implied question, 'Shall it be adopted?' and for that reason is a substantial compliance with the statute.

"In support of this contention it is urged, in effect, that the principal object of the bill was to secure at that time an expression of the voter on the question, 'Shall the capital be located?' and that an affirmative vote on that question would necessarily include an affirmative vote for the adoption of the bill. On the other hand, it is contended, in effect,

that the question, 'Shall the capital be located'?' was only one feature of the proposed bill, an affirmative vote on which cannot fairly be construed as a vote for the adoption of the entire measure. Assuming, as seems to be conceded by both sides, that a vote on the question, 'Shall the capital be located?' was at that time properly before the electors, we are of opinion that the latter contention must be sustained for the reason, among others, that while the question, 'Shall the capital be located?' gave the voter an opportunity to vote for or against one feature of the bill, it afforded him no choice to vote for or against the bill as a whole. To the conservative taxpayer, for instance, who took little interest in the capital controversy, but who came to the polls desiring to vote 'No' only against the adoption of the bill, on the ground, say, that it carried an appropriation of $600,000, there was for him no place on the ballot to register his vote. When it comes to voting on a bill involving, as this does, an expenditure of public money, we can say as was said by the court in *Cain et al.* v. *Smith et al.*, 117 Ga. 902, 44 S. E. 5, where the questions submitted to the voters were 'For bonds, and adoption' (of the proposed Act), and 'Against bonds and adoption': 'The voters are entitled to have this question submitted to them so that they may pass upon it freely and untrammeled by any other consideration than the question whether the debt shall be incurred. * * * ' To thus submit a bill by selecting therefrom what to designing persons interested in its passage might appear to address itself to the voter as its most persuasive feature, and thus secure its passage, would be in the nature of a fraud on the electorate of the state and not to be tolerated. As well might it be said, since that is also one feature of the bill, that an affirmative vote on the question, 'Shall 2,000 acres of land be purchased?' would be an affirmative vote on the question, 'Shall it be adopted?' or, 'Shall a Capital Commission of three be appointed?' an affirmative vote for the adoption of the bill as a whole. To say, then, that by voting for the location of the capital (perhaps in the estimation of the voter a minor

provision in the bill) he voted also for all the provisions in the bill including said appropriation, would be manifestly so unjust that we cannot so hold. * * *

"It will not do to say that the electors knew that by voting in the affirmative on the question, 'Shall the capital be located?' they were so voting by implication on the question, 'Shall it be adopted?' To practically this contention the court in *Lozier* v. *Alexander Drug Co.*, 23 Okl. 1, 99 Pac. 808, said: 'As to whether or not the electors, in voting on this proposition, understood that they were voting to repeal said article, and it was the intention of a majority of the electors of the state to so declare, this does not appear before this court in any way provided by law; but, if it appears *aliunde,* the same cannot be considered by this court for any purpose.'

"Again, it will not do to say that an affirmative vote on the question, 'Shall the capital be located?' included an affirmative vote on the implied question, 'Shall it be adopted?' for the reason that should this be true the illegality of the submission would continue to be apparent, as it has several times been held by this court in accord with the uniform holding of the courts that a submission is void where two propositions have been submitted so as to have one expression of the voter answer both propositions, and this for the reason that voters might thereby be induced to vote for both propositions who would not have done so if the question had been submitted singly. As the voter in this instance might have been against the adoption of the initiated bill, but desirous of locating the capital in the event the bill carried, the questions should have been separately submitted to him that he might so express his will. This was the effect of the holding of the court in *Lozier* v. *Alexander Drug Co.*, supra, where the court said: 'No opportunity was given the elector separately to express his will by his vote upon the question of the adoption or rejection of said provision as proposed to become a part of the Constitution to express such will as to whether or not said article 1 should be repealed.' To the same effect, see *Armstrong* v. *Berkey,* 23 Okl. 176, 99 Pac. 921; *State ex rel.*

*City of Bethany* v. *Allen, State Ad.*, 186 Mo. 673, 85 S. W. 531; *City of Denver et al.* v. *Hayes et al.*, 28 Colo. 110, 63 Pac. 311; *Village of Hempstead* v. *Seymour et al.*, 34 Misc. 92, 69 N. Y. Supp. 462." Therein the court holds that the form of the ballot was insufficient; that it did not substantially comply with the statute; and that the electors were not afforded an opportunity of expressing their will upon the several propositions contained in the proposed measure.

In the case of *Cress* v. *Estes*, 43 Okl. 213, 142 Pac. 411, 412, the court had under consideration the question, among others, whether or not there had been a compliance with the law in relation to the matter of the submission of an initiative measure providing for a constitutional amendment. The law of that state requires that the Attorney General shall notify the Secretary of State whether or not the title of a measure which it is proposed to submit to the electorate complies with the law. It provides further that citizens may circulate petitions initiating either an amendment to the Constitution or in relation to legislative enactment; and in the event that that is done, an "exact copy of same" shall be filed in the office of the Secretary of State, and the petition circulated filed within sixty days thereafter in the same office, and "no petition not filed in accordance with this provision shall be considered." (Sec. 3375, Rev. Laws 1910, Oklahoma.) The copy filed in the office of the Secretary of State was not an exact copy of the petition later circulated and signed and filed in the office of that officer. The defect consisted of a slight difference between the title of the Act contained upon the petition circulated, and the title as shown upon the copy filed in the office of the Secretary of State, the latter having been amended by the Attorney General of that state. By reason of the peculiar statutes of that state, the court held that a substantial compliance with the law had been had and that the slight difference between the title as contained in the petition circulated and the title as filed with the Secretary of State "affects in no way the substance or form of the proposed measure," and that therefore the sufficiency of the

procedure was sustained. The court, in commenting upon the matter, said: "It is conceded that said ballot title is a necessary part of said petition. The language of said section [sec. 3375 supra] being mandatory in requiring that the copy referred to be a true and exact copy of the original petition, if there were no other provisions of the statute on the subject, the court would be compelled to hold the difference in the wording of a copy and the original petition sufficient to prevent its consideration by the Secretary of State, or by this court when presented here; but by section 3393, Rev. Laws 1910, it is further provided, with reference to the procedure: 'The procedure herein prescribed is not mandatory, but if substantially followed will be sufficient. If the end aimed at can be attained and procedure shall be sustained, clerical and mere technical errors shall be disregarded.'" (See, also, *Ramsey* v. *Persinger* (*Scott et al., Interveners*), 43 Okl. 41, 141 Pac. 13.)

The provisions of sections 103 and 104, supra, are simple, understandable and a compliance therewith involves little if any difficulty. We hold that these provisions are mandatory and not directory, and that a substantial compliance therewith must be had. This is but a reiteration of the same principle announced by this court in 1921, when it had under consideration this very matter, in the *Bonner Case*, supra. In that case this court says, in reference to section 1, Article V, of the Constitution of Montana: "Under this constitutional provision, sections 110 and 111 of the Revised Codes, as amended by Chapter 66 of the Laws of 1913 [secs. 110 and 111 referred to are our sections 103 and 104 above], are controlling as to the administrative feature in the submission of such questions to the people and a substantial compliance with such legislative directions is necessary."

We are of the opinion, therefore, that the form of the ballot is defective and does not substantially or at all meet the requirements of the law, particularly in that (a) neither the title nor the legend are descriptive of the measure proposed; and (b) that the ballot contains neither the affirmative nor

the negative of the proposed measure, and that no opportunity is afforded the voter to express his will as to whether he is in favor of or opposed to the proposed measure.

The defendant contends that this court is without jurisdiction herein. As we understand defendant's counsel, this contention has for its basis two grounds: (1) That the plaintiff seeks merely to assert a private right and that the public has no interest in this controversy; and (2) that this action may not be instituted or maintained by a private corporation.

That this court may assume original jurisdiction and issue a writ of injunction in a proper case is firmly established. (Sec. 3, Art. VIII, Constitution of Montana; *State ex rel. Clarke* v. *Moran,* 24 Mont. 433, 63 Pac. 390, 393, and cases there cited; *State ex rel. City of Helena* v. *Helena Waterworks Co.,* 43 Mont. 169, 115 Pac. 200.) The state of Wisconsin has a constitutional provision similar to our section 3 of Article VIII. The supreme court of that state, in the case of *State ex rel. Lamb* v. *Cunningham,* 83 Wis. 90, 53 N. W. 35, 35 Am. St. Rep. 27, 17 L. R. A. 149, discusses this matter at great length.

Private rights are involved herein, but "public and private rights may be involved in the same case, and in protecting the public rights, private rights may incidentally be protected and enforced. Yet the rights of the public—that is, of the state—must be the paramount and moving consideration." (*State ex rel. City of Helena* v. *Helena Waterworks Co.,* supra; *Attorney General* v. *Railroad Companies,* 35 Wis. 425; *State ex rel. Clarke* v. *Moran,* supra.)

The facts hereinbefore stated present a case affecting directly the interests of the whole people of this state. We are governed by laws, which are enacted either by direct vote, as here, or by representatives chosen by us. Every citizen of this state is interested in seeing to it that our laws are obeyed. Every taxpayer of this state is interested in seeing to it that the public funds are not expended uselessly. Certainly, in a matter of such importance as the submission of this measure,

.which it is proposed to adopt as one of the laws by which we are to be governed, every person within the state is vitally interested. This court, in the case of *State ex rel. Clarke* v. *Moran,* supra, had under consideration the right of the people to choose their representatives, and in speaking of the importance thereof said: "The facts stated present a case affecting directly the interests of the whole people of the state. In our representative form of government, the whole people are interested in having the election laws enforced, to the end that the best possible results may be obtained. Especially is this true when we are engaged in the selection of men to whom we, at the same time, intrust the power to enact laws for the state, to otherwise regulate public affairs, and to provide for the collection, appropriation, and disbursement of the public revenues. Not only is every patriotic citizen interested in the selection of suitable candidates for members of the lawmaking body, but every citizen in the state has a direct personal interest in the proper conduct of the election by which a choice of candidates is made." Voting upon the adoption of a law is most certainly of as much importance as choosing our officers.

But, as hereinbefore noted, in the submission of this proposed measure, certain statutes of this state have been utterly ignored, and, as a result, if the measure were submitted in the manner proposed, and adopted, that result would not represent the will of the electors of this state.

From all of the foregoing, we conclude that the public is vitally interested in this matter; that the liberties of the people of this state are involved; and therefore, that, in so far as this phase of the matter is concerned, the objection that this court is without jurisdiction is not sustained.

This brings us to a consideration of the question whether ██ ██ or not the plaintiff may maintain this action. Defendants cite the cases of *Chumasero* v. *Potts,* 2 Mont. 242, *State ex rel. Clarke* v. *Moran,* 24 Mont. 433, 63 Pac. 390, *Poe* v. *Sheridan County,* 52 Mont. 279, 157 Pac. 185, in support of counsel's argument that the plaintiff may not main-

tain this action because a private corporation has never heretofore done so within this state. The fact that a corporation never before has instituted such an action is not proof conclusive that the plaintiff may not now exercise that function. Plaintiff is a private corporation. Defendants assert that nowhere is it made to appear that plaintiff is a taxpayer. It is true that there is no direct allegation to that effect. However, it does appear that the plaintiff has been and is the operator of 19 stores within the state of Montana; that each of these stores is licensed under the provisions of Chapter 155, supra; and that the plaintiff has paid such license. Applying the rule that, where facts are pleaded from which an ultimate fact must result, then it is not necessary to specifically plead such fact. (*Murphy* v. *Johns,* 56 Mont. 134, 135, 182 Pac. 115; *Grant* v. *Nihill,* 64 Mont. 420, 210 Pac. 914; *Doane* v. *Marquisee,* 63 Mont. 166, 206 Pac. 426; *Daily* v. *Marshall,* 47 Mont. 377, 133 Pac. 681), the conclusion is inescapable that the plaintiff is a taxpayer. In a situation such as the facts disclose exists here, reason would seem to dictate that this court should be more concerned with the facts developed—the public interest involved—than with the instrumentality or means by which those facts are brought to the attention of the court. The late Chief Justice Brantly, in the case of *State ex rel. Clarke* v. *Moran,* supra, in speaking of this very matter, observed: "A relator is not indispensable, but it is desirable that someone should stand to answer for the propriety of the suit, and be chargeable with costs if it be determined that the relief sought should be denied." (Citing *State ex rel. Lamb* v. *Cunningham,* 83 Wis. 90, 53 N. W. 35, 35 Am. St. Rep. 27, 17 L. R. A. 145, *State ex rel. Attorney General* v. *Cunningham,* 81 Wis. 440, 504, 51 N. W. 724, 15 L. R. A. 561; *State ex rel. Drake* v. *Doyle,* 40 Wis. 185, 22 Am. Rep. 692.) Here we have someone chargeable with the costs in case the court denies the relief sought.

The principal objection usually raised to a private person instituting an action of this nature is that defend-

ant may thereby be harassed with many suits. But it must be remembered that a proceeding commenced in this court must be with the consent of this court, and it may be said that it is not likely that the consent will be given unnecessarily. The Supreme Court of the United States, in the case of *Union Pacific R. R. Co.* v. *Hall,* 91 U. S. 343, 356, 23 L. Ed. 428, voiced its conclusions in that regard upon this matter in the following language: "Granting the writ is discretionary with the court, and it may well be assumed that it will not be unnecessarily granted."

A corporation is a person, within the meaning of the Fourteenth Amendment of the Federal Constitution. (1 Cook on Corporations, p. 70.) In the *Railroad Tax Cases,* (C. C.) 13 Fed. 722, 733, in speaking of the rights of corporations, it is said: "Whatever the state may do, it cannot deprive anyone within its jurisdiction of the equal protection of the laws. And by equal protection of the laws is meant equal security under them to everyone on similar terms,—in his life, his liberty, his property, and in the pursuit of happiness. It not only implies the right of each to resort, on the same terms with others, to the courts of the country for the security of his person and property, the prevention and redress of wrongs and the enforcement of contracts, but also his exemption from any greater burdens or charges than such as are equally imposed upon all others under like circumstances."

A writ of mandate commands an action to be done, while an injunction restrains the doing of an act. (18 R. C. L. 90, and cases there cited.)

In the case of *State ex rel. Adkins* v. *Lien,* 9 S. D. 297, 68 N. W. 748, 749, the court had under consideration the matter of the issuance of a writ of mandate commanding certain public officers to perform certain duties as provided by the Constitution of that state. Therein the right of the plaintiff to institute the action was called in question, and the court remarked: "As disclosed by the record, this proceeding was instituted to procure the enforcement of a public right,—a

matter of general interest to every voter and taxpayer of Roberts county, each one of whom, as a party beneficially interested, is entitled to compel by mandamus the performance of such public duty, specially enjoined upon the defendants as a board of county commissioners. *The rule that, where the relief sought is a public matter or one of public right, any taxpayer or elector may apply for and obtain a writ of mandamus, in a proper case,* to enforce the performance of such public duty, rests firmly upon reason, and is sustained by the great weight of American authority. (*Hyatt* v. *Allen*, 54 Cal. 353; *Chumasero* v. *Potts*, 2 Mont. 242; *State* v. *Brown*, 38 Ohio St. 344; *State* v. *Ware*, 13 Or. 380, 10 Pac. 885; *Sansom* v. *Mercer*, 68 Tex. 488, 5 S. W. 62 [2 Am. St. Rep. 505]; *State* v. *Weld*, 39 Minn. 426, 40 N. W. 561; *State ex rel. Thompson* v. *City of Kearney*, 25 Neb. 262, 41 N. W. 175 [13 Am. St. Rep. 493]; *Moses* v. *Kearney*, 31 Ark. 261; *State ex rel. Rice* v. *County Judge of Marshall Co.*, 7 Iowa, 186; *State ex rel. Hugg* v. *City Council of Camden*, 39 N. J. Law, 620; *Board of Commrs. of Clarke County* v. *State ex rel. Lewis*, 61 Ind. 75; *State* v. *Francis*, 95 Mo. 44, 8 S. W. 1; *Union Pac. R. Co.* v. *Hall*, 91 U. S. 343 [23 L. Ed. 428].)''

In the case of *State ex rel. Schilling* v. *Menzie*, 17 S. D. 535, 97 N. W. 745, a similar question was involved as that mentioned in the last preceding quotation, and the court there said: "It is contended that the court erred in overruling defendants' motion to dismiss on the grounds: (1) That the proceeding was commenced and prosecuted without the knowledge, advice, or consent of the state's attorney; and (2) that the relator has no special, specific, peculiar interest different from any other citizens of the county. This contention is clearly untenable. Where the relief sought, as in this case, is a public matter, or one of public right, any taxpayer or elector may apply for and obtain a writ of mandamus in a proper case to enforce performance of a public duty. (*State ex rel. Adkins* v. *Lien*, 9 S. D. 297, 68 N. W. 748.)''

The supreme court of California, in the case of *Hyatt* v. *Allen,* 54 Cal. 353, in speaking of the right of a taxpayer in connection with the inclusion of all the taxable property in the district upon the assessment rolls, has this to say: "We think that the petitioner, who is a taxpayer within the district of which the respondent is assessor, is 'a party beneficially interested' in having all the taxable property in the district assessed, and is therefore a proper party to make the affidavit for the issuance of the writ [mandamus] in this case." Bearing upon the same question are the following cases: *Garry* v. *Martin,* 70 Mont. 587, 227 Pac. 573; *Weatherer* v. *Herron,* 25 S. D. 208, 126 N. W. 244; *State ex rel. Thompson* v. *City of Kearney,* 25 Neb. 262, 41 N. W. 175, 13 Am. St. Rep. 493; *State* v. *Weld,* 39 Minn. 426, 40 N. W. 561; High's Extraordinary Legal Remedies, 3d ed., p. 421.

We conclude, therefore, that the plaintiff may institute and maintain this action.

Defendants contend that plaintiff is estopped to prosecute this action by reason of laches. For present purposes, we will consider as true each of the allegations of defendants' answer in relation to this phase of the matter. Conceding that plaintiff did not act herein as expeditiously as it might have done, yet we are of the opinion that the action should not be dismissed because of such failure on the part of the plaintiff. If this proceeding affected merely the private rights of the plaintiff, then doubtless the plea of laches would be good. This court has jurisdiction, as above noted, because of the public interest which attaches here. We are of the opinion that the liberties of the people of this state should not be jeopardized merely because the plaintiff has not acted with the greatest degree of celerity; and therefore such plea is not sustained.

As what we have already said disposes of this case, it becomes unnecessary to enter upon a discussion of other points made in the pleadings and in the briefs of the learned counsel for the respective parties.

182

The demurrers are overruled and the injunction is granted as prayed for in the complaint.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.

MR. JUSTICE MATTHEWS, being absent, takes no part in the foregoing decision.