Argued October 1, affirmed October 12, 1962

# COLUMBIA RIVER SALMON & TUNA PACKERS ASSOCIATION ᴇᴛ ᴀʟ *v.* APPLING AND MAKE STEELHEAD A GAME FISH, INC.

375 P. 2d 71

*John J. Tyner, Jr.,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs was Robert Y. Thornton, Attorney General, Salem.

*Herbert C. Hardy,* Portland, argued the cause for intervenor-appellant. On the briefs were Cake, Jaureguy, Hardy, Buttler & McEwen.

*Wendell Wyatt,* Astoria, and *John C. Beatty, Jr.,* Portland, argued the cause for respondents. On the brief were Wyatt, McDonald & Dean, Astoria, and Dusenberry, Martin, Beatty & Parks, Portland.

Donald S. Richardson, Portland, filed a brief on behalf of the Oregon AFL-CIO as amicus curiae.

Before McAllister, Chief Justice, and Rossman, Perry, O'Connell, Goodwin, Lusk and Denecke, Justices.

GOODWIN, J.

This is an appeal by "Make Steelhead a Game Fish, Inc." and others from a decree of the circuit court the effect of which is to strike from the ballot a measure to control commercial fishing.

The issue is whether those signatures which were obtained on petitions bearing a defective ballot title can be counted with signatures on petitions bearing the corrected ballot title to make up the total number of signatures needed to comply with Oregon Constitution, Art IV, § 1. It is conceded that without the signatures obtained on petition forms which bore the

defective ballot title there would be insufficient signatures to comply with Article IV, § 1. The appellants seek to have the measure placed on the next general election ballot despite the failure to obtain the required number of signatures after the ballot title was corrected.

The specific question grows out of our holding, in *Columbia River Packers v. Thornton,* 230 Or 472, 371 P2d 975, that the ballot title prepared by the attorney general did not comply with ORS 254.070 and 254.080. The defective title was carried on the early petitions to which more than half of the tendered signatures were appended. That title had advised potential petitioners that the purpose of the measure was to restrict commercial fishing for steelhead and to declare steelhead a game fish. The title certified by this court to the Secretary of State for use on the ballot states that the purpose of the measure is to restrict all commercial fishing on the Columbia River. (The proposed measure incidentally declares steelhead a game fish. It then virtually outlaws commercial fishing in the Columbia River during the summer months when a substantial number of salmon as well as steelhead are to be found in that stream.)

By statute since 1921, the species of trout commonly called steelhead have been designated as game fish. The manner of taking them likewise has been the subject of statutory control. (See Oregon Laws 1921, ch 153). It therefore appears that the ballot title preferred by "Make Steelhead a Game Fish, Inc." did not fairly disclose the purpose of the proposed measure. It was not necessary to decide in *Columbia River Packers v. Thornton,* supra, whether such non-disclosure was intended. We held merely that the title was insufficient. A ballot title which invited voters

to "restrict commercial fishing for steelhead" would not advise voters accurately concerning the matter to be voted upon. For an earlier case dealing with a related problem, see *Columbia River Packers v. Thornton,* 215 Or 1, 325 P2d 812.

The appellants now urge that even if the first ballot title was defective it should not follow that petitions subscribed while bearing that title must be rejected in computing the number of signatures needed to qualify the measure for the ballot.

ORS 254.070 requires the ballot title to appear on initiative petitions. The only logical purpose of such a requirement is to advise potential petitioners what the measure is about. *Boyd v. Jordan,* 1 Cal2d 468, 35 P2d 533. If it is important that the ultimate voters be apprised of the question upon which they are asked to vote, and no one disputes that it is, then it is also important that petitions seeking to put a matter on the ballot apprise the petitioners of the true issues involved. There is some support for the contrary view, but to encourage petitioners to masquerade under misleading captions would open the initiative process to abuse. Such a rule is demanded neither by statute nor by reason.

The appellants contend that if ballot titles on initiative petitions are now to be held to the same high standards of accuracy as are the titles on the election ballots such a rule may have an accidental secondary effect of crippling the referendum. It is sufficient to point out that the referendum is not before the court in the case at bar, and that the differences between initiative and referendum are so substantial as to afford adequate reasons to distinguish between them should such a question ever arise. See *Palmer v. Benson,* 50 Or 277, 91 P 579. Nothing said here in connec-

tion with the initiative need necessarily have any bearing upon the referendum.

■ In view of the failure of the early petitions to apprise the signers of the matter they were petitioning to have placed on the ballot, the circuit court correctly concluded that such signatures could not be counted. A petition to put one question on the ballot has no efficacy to put a different question on the ballot, even though the questions may be similar.

■ The appellants have also argued that the moving parties in this proceeding have no standing to sue (to enjoin the Secretary of State from putting matter on a ballot). The argument is based upon *P.G.E., a Corp. and Randall v. Judd,* 184 Or 386, 198 P2d 605, 6 ALR2d 547, and earlier decisions cited therein which held that relief under § 81–2105, OCLA, and its forerunners could be had only in the name of the state. (Suit must be brought by the attorney general or a district attorney.) The election code now provides that "any person adversely affected" by an act or failure to act on the part of certain election officials may appeal to the courts. ORS 246.910.[1] We need not now decide whether "person" as used in ORS 246.910

---

[1] **ORS 246.910. Appeal from Secretary of State or county clerk to courts.** "(1) Any person adversely affected by any act or failure to act by the Secretary of State or a county clerk under any election law, or by any order, rule, regulation, directive or instruction made under the authority of the Secretary of State or of a county clerk under any election law, may appeal therefrom to the circuit court for the county in which the act or failure to act occurred or in which the order, rule, regulation, directive or instruction was made or in which such person resides.

"(2) Any party to the appeal proceedings in the circuit court under subsection (1) of this section may appeal from the decision of the circuit court to the Supreme Court.

"(3) The circuit courts and Supreme Court, in their discretion, may give such precedence on their dockets to appeals under this section as the circumstances may require.

(election law) includes "corporation" as it does under ORS 174.100 (general definitions), because in the case at bar one of the plaintiffs was an individual. The statute set forth in the margin is obviously remedial and should be liberally construed. See *Recall Bennett Com. v. Bennett et al.,* 196 Or 299, 317, 249 P2d 479. The numerous decisions holding that suits against the Secretary of State in these matters must be brought in the name of the state no doubt expressed the common-law rule. See, e.g., *Friendly v. Olcott,* 61 Or 580, 123 P 53. However, ORS 246.910, enacted in 1957, obviously changes the law in this respect.

Affirmed; no party to recover costs.

O'CONNELL, J., dissenting.

In my opinion the majority of the court has misconstrued our statutes relating to the procedure for placing an initiated or referred measure on the ballot. The legislative assembly established two safeguards against the use of insufficient or unfair ballot titles in the initiative and referendum process. The first of these safeguards is found in the requirement that the ballot title appearing on the covers of the petition must be prepared by the Attorney General. The second safeguard was provided by the statutory requirement for judicial review of the ballot title so prepared. ORS 254.080. Thus, the legislature set up a procedure which, in each instance, calls for the surveillance of the ballot title by elected public officials; in the first instance by the Attorney General, and finally by the Oregon Supreme Court.

---

"(4) The remedy provided in this section is cumulative and does not exclude any other remedy provided by law against any act or failure to act by the Secretary of State or a county clerk under any election law or against any order, rule, regulation, directive or instruction made under the authority of the Secretary of State or a county clerk under any election law."

It will be noted that if the ballot title is revised by the Supreme Court, ORS 254.080 directs the Secretary of State to "print on the official ballot and in the voters' pamphlet the ballot title thus certified to him." The statute does not direct the Secretary of State or anyone else to change the ballot title on the petition. The directive relating to the ballot title which is to appear on the petition is found in ORS 254.060. There it is provided that the ballot title prepared by the Attorney General shall be transmitted to the Secretary of State, who in turn is directed to furnish a copy "to the persons or organizations under whose authority the measure is initiated or referred." If the legislature had intended that the ballot title on the petition was to be changed after the revision of the ballot title by the Supreme Court, one would expect to find an express statutory provision to this effect.

I would construe the statutes as providing this surveillance for two separate and distinct purposes. The first of these purposes was to provide a reasonably accurate description of the measure *on the petitions*. The task of providing this description was entrusted to the Attorney General. It is fair to assume that he was designated for this purpose because it was felt that he, as a public official, would act impartially in preparing the title. At this stage in the procedure for initiating or referring a measure the safeguard thus provided would seem adequate. The object of requiring a certain number of signatures on an initiative or referendum petition is simply to provide some assurance that the measure proposed is one which a substantial number of the electorate consider worthy of submission to the people for approval or disapproval. Those who sign the petition may, in fact, not favor the measure but may feel that the issue should

be resolved by the people. At this preliminary stage in the procedure the harm that can be done by an ambiguous ballot title is far less than that which may result from the same title when it appears on the official ballot. It is reasonable to assume that the legislature had this difference in mind in setting up the procedures for minimizing misleading ballot titles and that, while the legislature intended the Supreme Court to have the authority to pass upon the title before it is submitted to the people at the final and crucial stage when the vote is taken, it also intended that the title prepared by the Attorney General would be adequate without further modification by the Supreme Court at the preliminary, tentative and less important stage when the petition is circulated.

The construction adopted by the majority produces a very significant inhibition on the referendum process. The sponsors of a referendum petition must obtain the necessary signatures within 90 days after the legislative session in which the measure sought to be referred was passed. Under the majority's interpretation, the adequacy of the ballot title for the purpose of circulating a petition cannot be known with certainty until the Supreme Court passes upon the question. Consequently, the sponsors of the referendum cannot safely proceed with the gathering of signatures until the decision of the Supreme Court is obtained. Deducting the time allotted for appeal, the time necessary to get the matter at issue, the time necessary to have the matter heard and decided by the court, there would be insufficient time in most cases to obtain the necessary signatures. It would not seem that the legislature intended to put such an inhibitory obstacle in the way of the referendum process.