Connie FAIPEAS, Christina Neal, J. Les
Baird, Logan Wakefield, Anne Milton,
Herman Coen, Jr., Dan Carter, Jerry
Roop, Ileen Self, Faron W. Purget,
John F. Allen, Petitioners,

v.

MUNICIPALITY OF ANCHORAGE,
Respondent.

Allison E. Mendel, Mendel & Huntington, Anchorage, for petitioners.

Denis R. Lazarus, Asst. Mun. Atty., Richard L. McVeigh, Mun. Atty., Anchorage, for respondent.

Before MOORE, C.J., and RABINOWITZ, BURKE and MATTHEWS, JJ.

*OPINION*

MATTHEWS, Justice.

## I. FACTS AND PROCEEDINGS

On January 12, 1993, the Anchorage Municipal Assembly passed an ordinance which prohibited discrimination in public employment on the basis of an individual's sexual orientation. Soon thereafter a citizen's group, Citizens Against the Homosexual Ordinance, began circulating a petition for a referendum on the ordinance. The group obtained more than the minimum number of signatures required and filed the petition with the municipal clerk. On February 22, 1993, the clerk certified that the petition contained sufficient signatures and met the requirements of law. Following this certification, the clerk prepared the following referendum proposition for the April 20, 1993 municipal election:

> Should AO 92–116(S), which adds sexual orientation to the list of protected classes for the purpose of public employment or municipal contractors, remain law?
>
> Yes [ ]   No [ ]

Petitioners, Connie Faipeas and others (Faipeas) appealed the clerk's certification decision to the superior court and sought a stay of the election, so far as it pertained to the referendum, pending final decision of their appeal. The superior court denied Faipeas' motion for a stay. Faipeas then sought interlocutory review of this denial from this court. We granted their petition

for review and, on April 14, 1993, remanded this case to the superior court with instructions to grant a stay. Our order stated:

On consideration of the petition for review and the emergency motion for stay, filed on April 6, 1993,

IT IS ORDERED:

1. The petition for review from the order of the superior court denying petitioners' motion for a stay pending resolution of their administrative appeal is GRANTED.

2. The order denying petitioners' motion for stay is REVERSED and this case is REMANDED to the superior court with instructions to stay the municipal election scheduled for April 20, 1993, with respect to the referendum on Anchorage Municipal Ordinance 92–116(S), pending final determination on the merits of the appeal by the superior court.

3. a. Petitioners have made a clear showing of probable success on the merits with respect to their claim that the referendum petition presented the ordinance in a biased and partisan light. The title of the referendum petition is partisan and potentially prejudicial. It reads: "Referendum Petition to Repeal A 'Special Homosexual Ordinance.' " While opponents of the ordinance regard it as giving special rights to homosexuals, proponents view it as merely adding sexual orientation to the list of other important personal characteristics and choices such as gender, religion, race, and marital status, which are protected from discrimination in public employment.

b. The petition is subject to the requirements adopted in *Burgess v. Alaska Lieutenant Governor*, 654 P.2d 273, 275–76 (Alaska 1982), that initiative and referendum petitions and ballot proposition summaries must be truthful and im-

partial. Although these requirements are not explicitly set out in the Anchorage charter or ordinance pertaining to initiatives and referendums, they are necessarily implied.

c. Since petitioners have made a clear showing of probable success on the merits with respect to one of their contentions, injunctive relief is appropriate. Rulings in election cases should, if possible, be made prior to the election in order to avoid needless expense and the shock to public expectations which would result if an election were overturned. Since we have concluded that petitioners have made a clear showing of probable success on the merits with respect to their claim concerning the partiality of the referendum petition, it is not necessary for us to examine whether a similar showing has been made with respect to petitioners' contention that the ballot summary is not adequately descriptive.

4. This case is REMANDED to the superior court for further action consistent with this order. If it is not possible to reprint ballots for the April 20 election which do not contain the referendum, the court is authorized to order such other remedial measures as may be appropriate.

5. The relief we have granted moots the emergency motion for stay.

6. An opinion will follow.[1]

This opinion sets forth more fully the reasons for our April 14th order.

## II. STANDARD OF REVIEW

Two questions were decided by this court in granting a stay of the municipal election with respect to the referendum:

1) Did the referendum petition fairly and accurately describe the ordinance it sought to repeal?

2) Must a referendum petition in an election conducted by the Municipality of Anchorage fairly and accurately describe the ordinance it seeks to repeal?

---

**1.** Chief Justice Moore dissented from this order.

Concerning the first question, *Burgess v. Alaska Lieutenant Governor*, 654 P.2d 273 (Alaska 1982), controls. There the lieutenant governor's summary of an initiative was challenged as inaccurate and biased. After noting that the summary was required to be accurate and impartial, we announced the applicable standard of review: "In conducting this inquiry, we will utilize a deferential standard of review." *Id.* at 276. In a footnote we made it clear that the standard was not to be one where the court substituted its judgment for that of the lieutenant governor; instead, the lieutenant governor's summary would be upheld unless we could not reasonably conclude that the summary was impartial and accurate. "The burden is upon those attacking the summary to demonstrate that it is biased or misleading." *Id.* We applied the burden to Faipeas in this case.

Concerning the second question, this is an issue of law upon which we exercise our independent judgment. In doing so, we "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

## III. DISCUSSION

■ The referendum petition which the citizens' group circulated bore the following title:

### REFERENDUM PETITION TO REPEAL A "SPECIAL HOMOSEXUAL ORDINANCE"

In much smaller print, the petition read as follows:

In accordance with the provisions of Section 3.02, Article III of the Home Rule Charter for the Municipality of Anchorage and Section 2.50 Anchorage Munici-

pal Code, we the undersigned qualified voters of the Municipality of Anchorage submit this Referendum Petition calling for the repeal of Anchorage Ordinance 92–116(S), initially passed January 12, 1993 (Amending Title 5 of the Anchorage Municipal Code). In particular, the undersigned request that the question:

Should AO 92–116(S), which adds "sexual orientation" to the list of protected classes for the purpose of public employment or municipal contractors, remain law?

YES [ ] NO [ ]

be placed before the voters of the Municipality of Anchorage as a referendum question.

This petition, first circulated on January 20, 1993. All signatures must be secured within 90 days from the date of first circulation; and have the required signatures, date of signatures, residence and mailing address of the signers.

Faipeas contended that the referendum petition was inflammatory, inaccurate, and misleading. Additionally, they argued that the proposed ballot question was too abbreviated to impart to voters a reasonable understanding of the ordinance in question. As noted in our order, we accepted Faipeas' characterization of the referendum petition, stating:

The title of the referendum petition is partisan and potentially prejudicial. It reads: "Referendum Petition to Repeal A 'Special Homosexual Ordinance.'" While opponents of the ordinance regard it as giving special rights to homosexuals, proponents view it as merely adding sexual orientation to the list of other important personal characteristics and choices such as gender, religion, race, and marital status, which are protected from discrimination in public employment.

Order at ¶ 3.a.[2]

---

**2.** Our conclusion on this point made it unnecessary to reach Faipeas' alternative argument concerning the ballot question and we made no ruling on that point. Order at ¶ 3.c.

The true controversy in this case is not, however, whether the referendum petition characterized the ordinance in a biased and partisan way. It clearly does so.[3] The controlling legal question is whether referendum petitions which do not accurately and fairly characterize ordinances which they propose to repeal are legally acceptable. We hold that they are not.

Misleading referendum petitions in elections conducted by the State of Alaska are clearly not permitted. We held in *Burgess v. Alaska Lieutenant Governor*, 654 P.2d 273 (Alaska 1982), that referendum petitions must be truthful and impartial. In that case we approved of language used by the Colorado Supreme Court that a petition summary must be "a fair, concise, true and impartial statement of the intent of the proposed measure. The summary may not be an argument for or against the measure, nor can it be likely to create prejudice for or against the measure." *Id.* at 275 (quoting *In Re Second Initiated Constitutional Amendment Respecting the Rights of the Public to Uninterrupted Service by Public Employees of 1980*, 200 Colo. 141, 613 P.2d 867, 869 (1980)). We also approved the Arkansas Supreme Court's statement that a petition summary should be "complete enough to convey an intelligible idea of the scope and import of the proposed law, and that it ought to be free from any misleading tendency, whether of amplification, of omission, or of fallacy, and that it must contain no partisan coloring." *Id.* (quoting *Hope v. Hall*, 229 Ark. 407, 316 S.W.2d 199, 201 (1958)). Whether these requirements apply to a referendum conducted by the Municipality of Anchorage is the question we must decide.

*Burgess* interpreted the procedure for initiatives under state law. This procedure differs from the initiative and referendum procedures prescribed by the Anchorage Charter and Ordinance. Under state law the initial application proposing an initiative or referendum needs to be signed by only one hundred qualified voters. Once the application is filed with the lieutenant governor, the lieutenant governor prepares a petition which must contain "a summary of the subject matter." [4] The petition is circulated by its proponents, and if signed by qualified voters equaling at least ten percent of those who voted in the last general election, the proposition must be placed on the ballot.[5] The summary prepared by the lieutenant governor is required by statute to be "impartial." AS 15.45.090, AS 15.45.320.

In contrast, the statute governing petitions of a home rule municipality states only that "[a] home rule charter shall provide procedures for initiative and referendum." AS 29.10.030(a). There is no specific requirement of impartiality. In addition,

---

**3.** Neither in its opposition to the petition for review nor on its petition for rehearing did the municipality contend that the petition was not flawed by partisanship. The petition also inaccurately represents the ordinance, as the ordinance does not apply only to homosexuals, but prohibits discrimination based on sexual orientation, whether homosexual or heterosexual. (The Equal Employment Opportunities Commission has ruled that a claim that promotion was denied because claimant was a heterosexual rather than a homosexual was not cognizable under federal law because sexual preference is not a protected characteristic. *See Jordan v. Brady*, 1993 WL 96127 (N.D.Ill.).) The petition also fails to describe a provision of the ordinance which amends the unlawful employment practices chapter of the Anchorage equal rights ordinance. The amendment prohibits any interpretation requiring "that the less qualified be preferred over the better qualified because of race, color, religion, sex, national origin, marital status, or sexual orientation." This prohibition was newly added by the ordinance as to all forbidden bases for discrimination, not merely sexual orientation. AO 92–116(S) § 2(F).

**4.** Alaska Const. art. XI, § 3.

**5.** *Id.* The constitution also contains a requirement that the signers must be "resident in at least two-thirds of the election districts of the state. . . ." *Id.*

the initiative and referendum process governing the Municipality of Anchorage does not contain a number of the steps required in state elections. Petition proponents are not required to file an application for a petition with the municipality, nor does a city official prepare the petition. Instead, the proponents prepare the petition and solicit signatures of qualified voters without the assistance of municipal officials. Petitions must contain signatures in an amount equal to at least ten percent of the vote from the last mayoral election.[6] When the proponents believe that they have obtained the necessary number of signatures, they may file the petition with the municipal clerk who, under the charter, must "certify on the petition whether or not it is sufficient."[7]

The municipal charter is silent concerning the substantive content of an initiative or referendum petition. The Anchorage ordinance pertaining to initiatives and referenda does, however, impose requirements concerning the contents of petitions. Section 2.50.030 states that a petition must "*describe* the ordinance or resolution sought by the petition" and contain the date that the petition is first circulated.

Framed in the terms of the Anchorage ordinance, the question is whether section 2.50.030(A)'s mandate that the ordinance be "described" requires that the description be truthful, impartial, and comprehensible. Stated in this way, the question essentially supplies its own answer. A description which is untruthful, misleading, or which is not complete enough to convey basic information as to what the ordinance does, can-

not be regarded as a legally adequate or sufficient description within the meaning of the ordinance. The word "describe" in a legal context carries the requirement that the required description must be fair and accurate. The Supreme Court of Montana recognized the necessity of this requirement:

> "Description" in these circumstances signifies a fair portrayal of the chief features of the proposed law in words of plain meaning so that it can be understood by the persons entitled to vote. It must be complete enough to convey an intelligible idea of the scope and import of the proposed law. It ought not to be clouded by undue detail, nor yet so abbreviated as not to be readily comprehensible. It ought to be free from any misleading tendency, whether of amplification, of omission, or of fallacy. It must contain no partisan coloring. It must in every particular be fair to the voter to the end that intelligent and enlightened judgment may be exercised by the ordinary person in deciding how to mark the ballot.

*Sawyer Stores, Inc. v. Mitchell*, 103 Mont. 148, 62 P.2d 342, 348 (1936) (quoting *In re Opinion of the Justices*, 271 Mass. 582, 171 N.E. 294, 297 (1930)).[8]

The signature-gathering requirement of the referendum process serves an important screening purpose. An ordinance cannot be referred—placed on the ballot—merely because one or a few citizens disagree with the ordinance. A substantial showing of popular disapproval is required:

> The signature gathering requirement is important because it eliminates the initi-

---

**6.** Charter, Mun. of Anchorage § 3.02(a).

**7.** *Id.* § 3.02(b).

**8.** The fair and accurate description requirement arguably has constitutional stature. Article I, section 2 of the Alaska Constitution states:
>     All political power is inherent in the people. All government originates with the people, is founded upon their will only, and is instituted solely for the good of the people as a whole.
Referring to this provision in *Boucher v. Bomhoff*, 495 P.2d 77, 78 (Alaska 1972), we stated:

"it is basic to our democratic society that the people be afforded the opportunity of expressing their will on the multitudinous issues which confront them." A logical corollary to this interpretation of Article I, section 2 is that the people have a right to a fair and accurate summary of issues on which they are being asked to express their will. This right would extend to petitions in all elections subject to the state constitution, including those conducted by home rule municipalities.

ation of an expensive campaign process when there is insufficient public support for an initiative. Neither the state nor the opponents of a proposed bill should be required to spend the large sums of money required when a proposed bill is put on the ballot if there is not sufficient public support for the initiative.[9]

If a petition were to mischaracterize an ordinance in a manner designed to bring about general opposition to the ordinance, the signature requirement could be too readily overcome and the intended screening function of the requirement would be thwarted.

Moreover, referendum petitions under the Municipality of Anchorage's system, as well as under the system followed in state elections, are formal documents which are part of the lawmaking process. They should be a source of accurate information

for all citizens concerning what is being proposed.[10]

Our state constitution contains a number of formal safeguards which are designed to ensure that legislators are fully informed and have had an opportunity to debate and deliberate on the meaning of a proposed law.[11] These safeguards are "designed to engender a responsible legislative process worthy of the public trust," *Plumley v. Hale*, 594 P.2d 497, 500 (Alaska 1979); are meant to "ensure that the legislature knows what it is passing," *North Slope Borough v. SOHIO Petroleum Corp.*, 585 P.2d 534, 543 n. 11 (Alaska 1978); and are meant "to ensure deliberation prior to passage...." *Plumley*, 594 P.2d at 500.[12] Safeguards with a similar purpose are contained in the Anchorage Municipal Charter relating to the passage of ordinances by the municipal assembly.[13]

---

**9.** Note, Cynthia L. Fountaine, *Questioning the Desirability and Constitutionality of Legislating by Initiative*, 61 S.Cal.L.Rev. 735, 746 (1988).

**10.** The importance of an accurate and informative petition was also noted by the Montana Supreme Court:

The majority of qualified electors are so much interested in managing their own affairs that they have no time carefully to consider measures affecting the general public. A great number of voters undoubtedly have a superficial knowledge of proposed laws to be voted upon, which is derived from newspaper comments or from conversation with their associates. We think the assertion may safely be ventured that it is only the few persons who earnestly favor or zealously oppose the passage of a proposed law, initiated by petition, who have attentively studied its contents and know how it will probably affect their private interests. The greater number of voters do not possess this information....

*Sawyer Stores, Inc.*, 62 P.2d at 348–49 (quoting *Westbrook v. McDonald*, 184 Ark. 740, 43 S.W.2d 356, 360 (1931)).

**11.** Article II, § 13 of the Alaska Constitution provides:

Every bill shall be confined to one subject unless it is an appropriation bill or one codifying, revising, or rearranging existing laws. Bills for appropriations shall be confined to appropriations. The subject of each bill shall be expressed in the title. The enacting clause shall be: "Be it enacted by the Legislature of the State of Alaska."

Article II, § 14 provides:

The legislature shall establish the procedure for enactment of bills into law. No bill may become law unless it has passed three readings in each house on three separate days, except that any bill may be advanced from second to third reading on the same day by concurrence of three-fourths of the house considering it. No bill may become law without an affirmative vote of a majority of the membership of each house. The yeas and nays on final passage shall be entered in the journal.

**12.** We have held that at least one of these safeguards, the single subject rule, applies to state initiatives. *Yute Air Alaska, Inc. v. McAlpine*, 698 P.2d 1173 (Alaska 1985).

**13.** Thus except for emergency ordinances, ordinances may not be introduced and adopted at the same meeting. Instead, once an ordinance is introduced in writing and receives the approval of three assemblymen, the municipal clerk must publish a notice containing either the text of the ordinance or "an informative summary of its contents" calendaring a time and place for a public hearing concerning the ordinance and advising the public as to where copies of the ordinance may be obtained. The public hearing must be held at least seven days after publication of the notice. Charter, Mun. of Anchorage § 10.01(b). Further, the Municipal Code adds a requirement that each ordinance must be read before any vote is taken on it. AMC § 02.30.070(G).

These safeguards underscore a vital public interest in ensuring that laws be made by informed lawmakers:

> A basic requirement for good governing decisions—ones which properly balance the interests of those involved and create desirable results—is an informed electorate. The decision makers need to have a thorough understanding of both sides of an issue in order to make a reasoned, rational decision. Such understanding comes only from complete and accurate information.

Fountaine, *supra* note 9, at 738. The public interest in informed lawmaking requires that referendum and initiative petitions meet minimum standards of accuracy and fairness. "[O]ur main concern should be that all matters (legislative enactments, initiative petitions and even proposed resolutions) should be presented *clearly* and honestly to the people of Alaska." *Yute Air Alaska, Inc. v. McAlpine*, 698 P.2d 1173, 1188 (Alaska 1985) (Moore, J., dissenting.) To this end it is necessary "[t]o guard against inadvertence by petition-signers and voters and to discourage stealth by initiative drafters and promoters...." *Id.* at 1189.

## IV. CONCLUSION

■ For the above reasons, we concluded that Faipeas had made a showing that they would probably succeed on the merits of their contention that the petition circulated in this case failed to meet applicable legal requirements.

COMPTON, J., not participating.

MOORE, Chief Justice, dissenting.

I respectfully dissent from the court's opinion because it improperly imposes state referendum requirements on Anchorage home-rule referendum procedure. By striking the referendum from the ballot, I

believe that the court unnecessarily and unreasonably interfered in the political process.

## I. ADDITIONAL FACTS

From December 1992 to January 1993, the Anchorage Assembly debated the merits of ordinance AO 92–116. On four separate occasions, the Assembly conducted public hearings to enable citizens to express their views both for and against the ordinance. A total of 195 citizens, representing both sides of the issue, spoke at the public hearings. The hearings were broadcast on local cable television. The Assembly passed the ordinance on January 12, 1993. The mayor vetoed it three days later, and the Assembly overrode the veto on January 19.

Shortly after the Assembly overrode the veto a group of citizens began circulating a petition seeking a referendum on the ordinance. The referendum sponsors also placed a copy of the petition in the local newspaper. As the court notes, with masterful understatement in my opinion, "[t]he group obtained more than the minimum number of signatures required." [1] Following the Municipal Clerk's certification of the petition, Faipeas challenged the clerk's decision in superior court.

## II. DISCUSSION

The court strikes the referendum from the ballot by reading requirements applicable to state referendum procedures into the word "describe" as it is used in § 2.56.030 of the Anchorage Municipal Code. I find the court's interpretation strained and its analysis unpersuasive.

The court begins by focusing on state referendum procedures, noting that state referendum petitions "must be truthful and impartial." Opinion at 1218. This requirement is entirely reasonable given that AS

---

1. The group needed to obtain 5,672 signatures to place its petition on the ballot. Within a month after the mayor's veto was overridden, the group turned 20,000 signatures into the Municipal Clerk's office.

15.45.320 mandates that state referendum petitions contain an "impartial summary of the subject-matter." The court then reasons that because the state imposes a requirement of impartiality on its own officers, it should also be imposed on the citizens of a home-rule municipality as a matter of public policy. Opinion at 1220–1221. The only acceptable referendum description, in the court's view, is one devoid of any partisan sentiment.

To bolster this construction, the court relies on language drawn from a Montana case, *Sawyer Stores, Inc. v. Mitchell,* 103 Mont. 148, 62 P.2d 342, 348 (1936), in which the Montana Supreme Court construed a statute requiring a ballot to include a legend "descriptive of the measure proposed." *See* Opinion at 1219. The court's reliance on this case is misplaced. The court fails to distinguish between the function of petitions and ballots. The requirement that the *Sawyer* court quite properly imposed on ballots has no place on petitions. A ballot is the paper upon which each voter gives expression to his or her choice. *Id.* A biased, misleading, or inaccurate ballot undermines the voting process. *Id.* A petition, however, is the vehicle by which citizens bring an issue into the public arena. It is the beginning, not the end, of political debate.

Equally strained is the court's attempt to justify imposing this requirement on peti-

tioning citizens by "necessarily impl[ying]" state petition requirements into the Anchorage procedure. The court's analogy understates the fundamental differences between the state and Anchorage referendum processes. It also ignores the fact that the state deliberately opted not to impose those requirements on Anchorage and other home-rule municipalities.

Under the state scheme, citizens propose a referendum by filing an application and a $100 filing fee with the lieutenant governor. AS 15.45.260. Within seven calendar days, the lieutenant governor must review the application and either certify it or notify the referendum sponsors of the grounds for denial. AS 15.45.300. The three grounds for denial do not include the partiality of the petition. If the application is certified, the lieutenant governor must prepare a petition within seven calendar days. AS 15.45.320. It is here that the state's requirement of impartiality comes in. The state-prepared petition must contain, among other things, an impartial summary of the subject matter of the act. *Id.*

The state referendum procedure is directly analogous to the procedure the legislature mandated for non-home rule municipalities.[2] However, the legislature expressly declined to impose those requirements on Anchorage and other home-rule municipalities. Instead, it gave them the right to develop their own procedures.[3]

---

**2.** In non-home rule municipalities, citizens seeking a referendum must file an application, signed by at least ten people, with the municipal clerk. AS 29.26.110. The clerk must certify the referendum application within two weeks if the clerk determines the application is in the proper form. AS 29.26.110. Within two weeks of certification, the clerk must prepare a petition containing a summary of the ordinance or resolution to be referred. AS 29.26.120. This petition must be signed by 25 percent of the votes cast in the last regular election if the municipality has fewer than 7,500 persons, or 15 percent of the votes cast in the last regular election if the municipality has 7,500 persons or more. AS 29.26.130(b).

**3.** The Alaska Legislature left home-rule municipalities free to choose their own referendum procedures. When the legislature revised the

municipal code in 1975, it explicitly stated which provisions it intended to apply to home rule municipalities:

> Home rule limitations are gathered together and listed in one place in Article 2 of the chapter (Sec. 29.13.100) [renumbered to 29.-10.200 in 1985]. The listing *makes explicit the legislative intent as to which provisions* of the code *apply to home rule municipalities, as prohibitions on acting otherwise than as provided, and which do not.* Additionally, the provisions themselves contain a specific reference making them applicable to home rule municipalities. The listing and specific references in the provisions are intended to coincide. (As additional provisions of law are enacted subsequent to the time the code takes effect, provisions which are intended to apply to home rule as well as to general law munici-

The Municipality of Anchorage exercised that right and placed the responsibility of preparing petitions directly in the hands of its citizens. Under the Anchorage Municipal Code, initiative and referendum petitions must:

A. Describe the ordinance or resolution sought by the petition;

B. State upon the petition, when circulated, the date of first circulation of the petition;

C. Contain the statement, when circulated, that the signatures on the petition must be secured within 90 days from the date of the first circulation; and

D. Have the required signatures, dates of signatures and resident and mailing addresses of the signers, unless the signers' qualifications can be ascertained from the state voter registration rolls on the basis of either residence or mailing address.

AMC 2.50.030. The petition must be signed by a number of qualified voters equal to at least 10 percent of the votes cast at the last regular mayoral elections. AMC 2.50.040(A). Nowhere does the ordinance require that the petition description be free from partisan coloring.

Anchorage would of course be free to require that citizen prepared petitions be couched in neutral language. But there is no constitutional or statutory requirement that it do so.[4] Courts across the country have repeatedly recognized the broad authority of home-rule municipalities to define the manner in which their citizens may exercise the powers of initiative and referendum. *See Leach & Arnold Homes, Inc. v. City of Boulder,* 32 Colo.App. 16, 507 P.2d 476, 477 (1973); *see also Burks v. Lafayette,* 142 Colo. 61, 349 P.2d 692 (1960); *Brown v. Boyd,* 33 Cal.App.2d 416, 91 P.2d 926 (1939); *Long v. City of Portland,* 53 Or. 92, 98 P. 149 (1908); *State ex rel. Snyder v. Board of Elections of Lucas County,* 78 Ohio App. 194, 69 N.E.2d 634, 33 O.O. 519 *dismissed as moot,* 146 Ohio St. 556, 67 N.E.2d 322, 33 O.O. 43 (1946); *see generally* 5 Eugene McQuillin, *The Law of Municipal Corporations,* § 16.42 at 290 (3d ed. re. vol. 1989).

However, in an exercise of judicial "interpretation," the court concludes that the term "describe," as used in the Anchorage ordinance, necessarily implies that the description be impartial and that the petition itself must be "a source of accurate information for the uncommitted citizen concerning what is being proposed." I disagree. When citizens launch a referendum drive, they are by their very actions expressing disapproval and disagreement with their government. They are expressing this disagreement both to the government and to their fellow citizens. The entire referendum process is inherently "biased and partisan"; it is political.

The court suggests that the partisan rhetoric of the petition title in this case thwarted the screening function of the petition in the referendum process. Opinion at 1219. The court's reasoning is a classic example of ivory-tower thinking. The prac-

---

palities as prohibitions on acting otherwise than as provided should make a specific reference to home rule municipalities within the provision and should, under the form of the new code, also be included in the listing under Sec. 29.13.100, so as to maintain clearly the legislative distinction as to which code provisions apply to home rule municipalities and which do not.)
1972 House Journal 1720 and 1972 Senate Journal Supp. 3, p. 3 (emphasis added).
    AS 29.10.200 does not list the non-home rule initiative and referendum procedures. The Legislature unquestionably did not intend them to apply to home-rule municipalities. To the con-

trary, it intended non-home rule municipalities to be unconstrained by requirements controlling state initiative and referendum procedures.

**4.** I do not find persuasive the court's curious constitutional argument that because "it is basic to our democratic society that the people be afforded the opportunity of expressing their will on the multitudinous issues which confront them," they should be denied the right to raise those issues before the public forum in their own words. *See* Opinion at 1219, n. 8 (quoting *Boucher v. Bomhoff,* 495 P.2d 77, 78 (Alaska 1972)).

tical reality is that petition tables are staffed by enthusiastic advocates who disseminate their positions with banners and slogans. In the face of such partisanship, I find it highly doubtful that a neutrally worded petition title would have measurably affected the petition drive itself.[5]

In addition, it must be remembered that this case involved a referendum seeking to repeal an existing ordinance, rather than an initiative proposing new legislation. As the Oregon Supreme Court has observed, the distinction is significant.

> The purpose of the petition for referendum *is to identify a particular enactment of the legislative assembly which the petitioners desire to have referred to the people*—a question of identity, not of legislation. There is a distinction in that regard between the referendum and the initiative, in which latter legislation is initiated and the whole matter must be formulated just as it is to be submitted to the people, while in the referendum it is only a question of the approval or disapproval by the people of what the Legislature has already enacted into law.

*Palmer v. Benson*, 50 Or. 277, 91 P. 579, 580 (1907); *see also Columbia River Salmon & Tuna Packers Ass'n v. Appling*, 232 Or. 230, 375 P.2d 71, 73 (1962) (reiterating functional differences between initiatives and referendums).

The description requirement of the Anchorage Municipal Code in the referendum context is clearly designed to identify the ordinance challenged. The petition in this case did just that:

> [W]e the undersigned qualified voters of the Municipality of Anchorage submit this Referendum Petition Calling for the repeal of Anchorage Ordinance 92–116(S), initially passed January 12, 1993 (Amending Title 5 of the Anchorage Municipal Code). In particular, the undersigned request that the question:
>
> > Should AO 92–116(S), which adds "sexual orientation" to the list of protected classes for the purpose of public employment or municipal contractors, remain law? YES [ ] NO [ ]
>
> be placed before the voters of the Municipality of Anchorage as a referendum question.

The biased wording in the petition's title does not negate the fact that the petition itself identified the ordinance in question. The title was, at most, surplusage.

This court has adopted a deferential standard of review when analyzing the sufficiency of initiative and referendum petitions. *See Burgess v. Alaska Lieutenant Governor*, 654 P.2d 273, 276 (Alaska 1982).

> In reviewing an initiative prior to submission to the people, the requirements of the constitutional and statutory provisions pertaining to the use of initiatives should be liberally construed so that "the people [are] permitted to vote and express their will on the proposed legislation ... all doubts as to technical deficiencies or failure to comply with the exact letter of procedure will be resolved in favor of the accomplishment of that purpose."

---

**5.** Some commentators have cast doubt on the notion that language in petitions and ballots has a measurable effect on election results. *See* Robert Horvat, "The Oregon Initiative Process: A Critical Appraisal" 65 Oregon L.Rev. 169, 172 (1984).

Furthermore, the citizens of Anchorage were unusually knowledgeable about this particular ordinance. The Assembly considered the issue for weeks. It held four public hearings, at which 195 citizens expressed their views. The hearings were broadcast on local cable television. Additionally, the ordinance received extensive coverage by the local electronic media and press. For example, from December 1, 1992, when the Assembly held the first public hearing concerning the ordinance, until February 16, 1993, the day before the petitions were given to the Municipal Clerk, the Anchorage Daily News had at least seven articles on page one; 11 articles on the first page of the paper's Metro section; 37 letters to the editor; and 16 editorials and other articles referring to the ordinance. Because over twenty thousand voters signed the petition in this case, while only 5,672 were required, an impartially worded petition would have almost certainly garnered the number of signatures required to place the referendum on the ballot.

*Yute Air Alaska, Inc. v. McAlpine,* 698 P.2d 1173, 1181 (Alaska 1985). The court has disregarded this precedent and stretched to find a defect in the petition. This act of judicial legislation has unreasonably deprived the citizens of Anchorage of the opportunity to vote on this issue.